# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 21-1221V

| | |
|---|---|
| THOMAS KENNY,<br><br>　　　　　　　Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　　　Respondent. | Chief Special Master Corcoran<br><br><br>Filed: September 9, 2025 |

*Jimmy A. Zgheib, Zgheib Sayad, P.C.,* White Plaines, NY, for Petitioner.

*Sarah B. Rifkin, U.S. Department of Justice,* Washington, DC, for Respondent.

**RULING ON ENTITLEMENT**[1]

On April 15, 2021, Thomas Kenny filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that as a result of an influenza ("flu") vaccine received on August 17, 2020, he suffered a right shoulder injury related to vaccine administration ("SIRVA") as defined by the Vaccine Injury Table (the "Table"). Petition at 1 (ECF No. 1). The case was assigned to the Special Processing Unit of the Office of Special Masters.

---

[1] Because this ruling and decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means this Ruling/Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons discussed below, I find that Petitioner has carried his burden of proof in establishing that he suffered a Table SIRVA injury, and therefore is entitled to compensation.

## I. Relevant Procedural History

This claim was initiated on April 15, 2021. (ECF No. 1). Petitioner subsequently filed updated medical records as well as affidavits supporting his claim. On July 26, 2022, Respondent filed his Rule 4(c) Report in which he contested entitlement. (ECF No. 21). Thereafter, Petitioner was ordered to file additional evidence to support his claim, which he did throughout October of 2023. On October 20, 2023, Petitioner filed the instant Motion for Ruling on the Record regarding entitlement. (ECF No. 28). Respondent filed his Response brief on December 4, 2023. (ECF No. 29). Petitioner filed a Reply brief on December 11, 2023. (ECF No. 30). The matter is now ripe for disposition.

## II. Relevant Medical History

### A. Medical Records

Petitioner's pre-vaccination medical history reveals no evidence of right shoulder pain or dysfunction. On August 17, 2020, Petitioner received a flu vaccine at his local Rite Aid pharmacy. Ex. 2 at 4. The vaccine administration record indicates that the vaccine was administered intramuscularly in his "Left Upper Arm." *Id.*

On December 8, 2020, Petitioner saw his primary care provider ("PCP") for "constant pain in his right shoulder after getting a flu shot [on] 9/3/20."3 Ex. 4 at 23. Petitioner recalled that the vaccine was administered very high up his arm, near his shoulder. *Id.* On exam, Petitioner exhibited swelling, tenderness, and warmth around the right AC joint, but no tenderness in his rotator cuff. *Id.* He displayed limited range of motion with abduction. *Id.* Petitioner's PCP, Michelle Ecker, M.D., documented right shoulder pain and "AC joint arthropathy." *Id.* She prescribed tramadol for petitioner's pain and recommended an orthopedic evaluation. *Id.*

On December 14, 2020, Petitioner saw orthopedist Robert Ranelle, D.O. Ex. 5 at 45. Petitioner reported a "sudden onset of constant episodes of severe right shoulder pain," rating his pain at a 10/10. *Id.* Petitioner stated that "he had a shot in the right shoulder for the flu about 4 months ago and . . . had the insidious and progressive onset of severe shoulder pain ever since." *Id.* Tramadol and Motrin offered no relief, and the pain interfered with petitioner's daily activities, namely "what he really love[d] to do which [was] hunting[,] which [was] the real reason why he came to the doctor." *Id.* Dr. Ranelle noted:

2

> [Petitioner] has severe severe [sic] pain in the right shoulder making it difficult for him to remove his shirts. Clinically[,] he has no obvious atrophy or fasciculation [and] there is no deformity. He has exquisite pain in the anterior subacromial space as well as severe pain over the biceps tendon. His passive motion is so severe that I had [to] give[] 2 [cortisone] shots [prior] to examining [him]. [Additionally, petitioner had] very severe and painful impingement test[s] . . . .

*Id.* at 46. Dr. Ranelle felt that Petitioner's symptoms were "consistent with [a] rotator cuff injury." *Id.* at 47. He prescribed a Medrol Dosepak and indomethacin (an NSAID) and recommended that petitioner obtain an MRI. *Id.* A January 5, 2021 MRI revealed a small anterosuperior labral tear, plus tears in the supraspinatus tendon and moderate subscapularis tendinosis. Ex. 5 at 20.

On January 7, 2021, Petitioner returned to Dr. Ranelle. Ex. 5 at 14. His pain had "markedly improved" following his cortisone injections. *Id.* at 15. An exam showed mild impingement signs, full strength, mild discomfort, and nearly full range of motion (80% in all planes). *Id.* at 14. Dr. Ranelle reviewed the MRI results and diagnosed petitioner with an incomplete rotator cuff tear. *Id.* at 15. He recommended conservative treatment with physical therapy ("PT"), medication, and allowing the injury to heal with time. *Id.* Dr. Ranelle opined, "I do not feel his problems are related to the flu shot that he had," noting that vaccine injuries are "usually inflammatory type reactions." *Id.* According to Dr. Ranelle, Petitioner "ha[d] no sign of" an inflammatory reaction, and the flu vaccine bore "no relation to the physical problems in his shoulder." *Id.*

One week later, on January 13, 2021, Petitioner underwent an initial PT evaluation. Ex. 6 at 3. At the evaluation, he complained of "extreme" right shoulder pain (10/10) and limited mobility in his arm. *Id.* An initial exam revealed diffuse muscle atrophy in the upper quarter of his right arm, mild edema, limited active range of motion, decreased strength, tenderness to palpation, and positive impingement tests. *Id.* at 3-4. Petitioner began a course of twice-weekly PT. *Id.* at 5.

Petitioner returned to Dr. Ranelle on February 17, 2021, six months post-vaccination. Ex. 5 at 69. He reported improvement with physical therapy and rated his pain at a 5/10. *Id.* He displayed no impingement signs and had "excellent" strength. *Id.* His range of motion in his right shoulder was 90% normal, with only mild pain upon movement. *Id.* Dr. Ranelle administered a Depo-Medrol injection in the subacromial space. *Id.* Notably, Petitioner complained that he was now experiencing pain in his *left* shoulder, plus "multiple other issues that he want[ed] evaluated."4 *Id.* at 70. Dr. Ranelle recommended physical therapy for both shoulders and a follow-up visit in six weeks, with

3

the intention of transitioning Petitioner to a home exercise program and anti-inflammatories as needed. *Id.*

On March 22, 2021, Petitioner saw rheumatologist Elana Eisner, M.D., reporting a "gradual onset of pain in his shoulders, lateral hips, and right knee." Ex. 7 at 13. Petitioner indicated that "he had a flu shot injected into his right subacromial bursa area last August," and "then developed severe pain to the shoulder with gradual progression to the other joints mentioned." *Id.* Upon exam, he had full range of motion in his shoulders and hips but experienced pain with movement. *Id.* He displayed bursal tenderness in both shoulders. *Id.* Dr. Eisner ordered additional testing to rule out a reactive arthritis, polymyalgia rheumatica ("PMR"), Lyme disease, and crystal arthropathy. *Id.*

Petitioner continued PT for right shoulder stiffness and "[d]iffuse pain overall." Ex. 11 at 3. He attended nineteen sessions through March 29, 2021.5 *See id.* By that time, he was showing "overall gains in mobility strength and function." *Id.* His right shoulder pain had decreased and was "much more manageable during the course of the day and night time." *Id.* Petitioner emphasized his "goal of avoiding any surgical intervention" and expressed a preference for more conservative therapies. *Id.* Although his right shoulder was improving, Petitioner again reported that his "left shoulder and rght [sic] knee [were] increasing in pain and movement dysfunction." *Id.*

On April 5, 2021, Petitioner returned to his orthopedist, Dr. Ranelle. Ex. 9 at 6. Petitioner stated that his shoulders were "feeling better," although he continued to have difficulty sleeping. *Id.* In addition to shoulder pain, he reported bilateral hip and knee pain. *Id.* at 7. Dr. Ranelle noted that Petitioner's recent bloodwork results showed no signs of inflammation or other abnormalities, apart from a Vitamin D deficiency. *Id.* at 6; *see also* Ex. 7 at 18-22 (results as of March 25, 2021); Ex. 10 at 22. An exam revealed excellent range of motion in both shoulders, excellent strength, and no impingement signs. Ex. 9 at 7. Dr. Ranelle prescribed indomethacin for pain and Neurontin to aid petitioner's sleeping. *Id.* He felt that Petitioner could stop PT and transition to a home exercise program. *Id.* He opined, "The patient asked me if his symptoms were related to the flu injection that he had[,] and I do not feel he has any type of inflammatory reaction from an injection in lieu of negative lab work and no true sign of any IgG mediated response." *Id.* at 8.

Petitioner continued to see his rheumatologist, Dr. Eisner. On April 19, 2021, petitioner underwent a fluid aspiration and lidocaine injection in his right knee. Ex. 10 at 23-24. Dr. Eisner noted that although Petitioner's recent lab results showed no inflammatory markers, she "would not discard PMR as a potential diagnosis" for his

ongoing shoulder, hip, and knee pain. *Id.* at 22-23. She prescribed a Medrol Dosepak. *Id.* at 25.

Dr. Eisner reiterated the potential PMR diagnosis during a follow-up visit on May 25, 2021, but also considered osteoarthritis as a potential cause, stating, "[We] discussed that this could be mild/early PMR but history and exam is more consistent with oa." Ex. 10 at 16. She observed that Petitioner's right knee aspiration was "very mildly inflammatory and showed pseudogout crystals." *Id.* Petitioner was "doing better overall" but was still experiencing "mild, short lived" stiffness in his shoulders and hips. *Id.* Dr. Eisner recommended that Petitioner continue taking indomethacin and repeat his lab tests to check for inflammatory markers. *Id.* at 16-17.

Petitioner's repeat lab results were unremarkable. Ex. 10 at 5, 27-31. On July 28, 2021, Petitioner returned to Dr. Eisner with complaints of severe pain in his right shoulder. *Id.* at 11. An exam was "consistent with bursitis." *Id.* Petitioner also reported worsening pain in his right knee. *Id.* Dr. Eisner administered steroid injections in petitioner's right knee and right subacromial bursa. *Id.* at 13. She advised Petitioner to discontinue indomethacin and to try meloxicam for his pain. *Id.* at 14.

On August 19, 2021, Petitioner saw his PCP, Dr. Ecker, for an annual exam. Ex. 12 at 9. Petitioner reported that he had been taking meloxicam for degenerative disc disease and that he had received steroid injections in his knee and right shoulder. *Id.* He stated that his shoulder pain had "resolved," and he had normal range of motion on exam. *Id.* at 9-10.

Petitioner returned to his rheumatologist, Dr. Eisner, on October 18, 2021. Ex. 10 at 5. The steroid injections Dr. Eisner had administered in July 2021 had been "very helpful," and daily meloxicam further relieved petitioner's symptoms. *Id.* Petitioner reported some mild, aching pain in his right shoulder, particularly on days when he was not using meloxicam. *Id.* Dr. Eisner recommended daily use of meloxicam, possibly at a reduced dose, and she suggested a follow-up visit in five-to-six months. *Id.*

Petitioner returned to Dr. Eisner for follow-up care on February 15, 2022. Ex. 14 at 2. He was "doing well" and taking meloxicam sporadically, "sometimes just once weekly." *Id.* Petitioner exhibited mild subacromial bursitis in his right shoulder but "otherwise no active synovitis." *Id.* His lab work was normal, with no signs of inflammatory arthritis or PMR. *Id.*

Petitioner did not seek any medical care for fifteen months. He saw Dr. Eisner again on May 25, 2023. Ex. 16 at 10. He had mild crepitus and pain in his left shoulder

5

but no pain, tenderness, or range of motion deficits on his right side. *Id.* at 13. Dr. Eisner advised petitioner to continue taking meloxicam as needed. *Id.* at 10.

Most recently, Petitioner visited his PCP for an annual exam on September 26, 2023. Ex. 17 at 11. Petitioner was taking meloxicam as needed for right shoulder pain and degenerative joint disease. *Id.* He "believe[d] [that his right] shoulder problem was caused by [a] flu shot injected into [the] shoulder joint." *Id.* He received a flu vaccine in his right deltoid at this annual visit. *Id.* at 16.

### B. Personal Statements

Petitioner has submitted a declaration and a sworn affidavit in support of his claim. Upon review, the declaration, executed on April 15, 2021, and filed into the record on April 22, 2021, is identical to the affidavit, which was executed and filed on October 20, 2023, with the exception that the affidavit contains five more paragraphs which speak to Petitioner's condition since the filing of his claim. *Compare* Ex. 3 *with* Ex. 18.

In his affidavit, Petitioner begins by asserting that the vaccination record which shows the flu shot was given in his left arm was mistaken because he is left arm dominant and remembers specifically requesting and receiving the vaccination in his non-dominant right arm. Ex. 18 at ¶ 3. He notes that his symptoms of pain began immediately after vaccination and that his hope was that with rest his symptoms would subside on their own. *Id.* ¶ 5.

Petitioner states that by September 7, 2020, he was concerned enough about his continued right shoulder pain that he contacted his PCP via text message and was advised to take over-the-counter pain medication, which he avers did not help his symptoms. *Id.* ¶ 6. He saw his PCP in person on December 8, 2020, when he was prescribed Tramadol and referred to an orthopedist. *Id.* ¶ 7.

Petitioner goes on to describe the course of his treatment, including undergoing an MRI which revealed a torn rotator cuff, twice-weekly sessions of PT, shoulder injections, his visits to a rheumatologist, and how he continued to see her with complaints of right shoulder pain, for which he was prescribed Mobic and given steroid injections for diagnosed bursitis. *Id.* ¶¶ 8-17.

Petitioner's final medical visit recount indicates that on September 25, 2025, he went for an annual physical with complaints of ongoing pain since his flu vaccination in 2020 – Petitioner's doctor diagnosed him with a torn rotator cuff and told him to continue taking Mobic. *Id.* ¶ 18. He indicates that he continues to have pain, limitations, and

dysfunction in his right shoulder to this day which impacts his sleep, activities of daily living, and recreational activities such as hunting. *Id.* ¶ 19.

### III. Parties' Respective Arguments

Petitioner argues that preponderant evidence establishes that he received the August 17, 2020, flu vaccine in his non-dominant right arm, that he had onset of symptoms within 48 hours after vaccination, and that he is accordingly entitled to compensation for his Table SIRVA claim. Motion at 2. Respondent argues that Petitioner has preponderantly established that he received the subject flu vaccine in his right arm as opposed to his left arm as stated in the vaccine administration record. Response at 9. Respondent further argues that even if Petitioner can establish he received the flu vaccination in his right arm, he has not established onset within 48 hours of vaccination due to a nearly four-month delay in seeking treatment, and that his pain was not limited to his right shoulder. *Id.* at 13.

### IV. Applicable Law

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

7

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## V.   Analysis

### I.   Fact Findings – Onset and Entitlement

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). In addition to requirements concerning the vaccination received, the

duration and severity of petitioner's injury, and the lack of other award or settlement,[3] a petitioner must establish that he suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of an influenza vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

> (i) No history of pain, inflammation, or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally

---

[3] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of his injury for more than six months, died from his injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for his injury. *See* § 11(c)(1)(A)(B)(D)(E).

contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, the Federal Circuit has recently "reject[ed] as incorrect the presumption that medical records are always accurate and complete as to all of the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). Medical professionals may not "accurately record everything" that they observe or may "record only a fraction of all that occurs." *Id.*

Medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381 at 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184 at 204 (2013) (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## A. Factual Findings Regarding Petitioner's August 17, 2020, Vaccination

With respect to the situs of Petitioner's August 17, 2020 vaccination. Respondent notes that the vaccine administration record documents an injection in Petitioner's *left* arm, not his right. Report at 7. Respondent then argues that Petitioner has failed to offer preponderant evidence that he received the vaccination in his right arm as alleged, because he has failed to produce any extrinsic evidence, such as subpoenaed pharmacy records, to complete the missing portion of his consent form, or any handwritten notation or medical letter suggesting that Petitioner was actually vaccinated in his right arm. Report at 7; Response at 11. Respondent also asserts that although Petitioner has stated that he routinely receives his yearly flu vaccine in his non-dominant right arm, he has historically received vaccines in his left arm as well, including two Shingrix vaccinations in 2018. Response at 10.

Petitioner argues that the vaccine administration record is incorrect, and that he received other vaccinations at the Rite Aid Pharmacy in his non-dominant right arm. He also maintains that the computer-generated service detail forms from those visits also incorrectly list the site of vaccination as the left arm, and that in those cases the handwritten consent forms correctly state that the vaccines were actually administered in the right arm. Motion at 10; Ex. 13 at 5-16. Petitioner notes that the handwritten consent form from his August 17, 2020 vaccination was improperly scanned, so that the notation in which he would typically circle "RA" to indicate he wanted to receive the vaccine in his right arm was not included.

Upon consideration of the record, I find that it is more likely than not that the notation for administration in the left arm on for the August 17, 2020 vaccination is in error. Petitioner's other vaccination records from flu vaccines he received both before and after this event establish a repetitive pattern in several respects. First, every service detail form lists the site of administration as "Left Upper Arm." Ex. 13 at 6, 12, 15. The two of those visits in which the handwritten consent form is fully available indicates that Petitioner chose to have the vaccination in his right arm, suggesting that the service detail form is incorrect. *Id.* at 8, 17. Petitioner also received all of his flu vaccines at the same Rite Aid (listed as location 7834). *Id.* at 6, 12, 15.

From the foregoing, it can be concluded that this particular Rite Aid pharmacy lists the site of administration for vaccinations as the left arm *by default,* and that the service detail forms produced will accordingly be in conflict. It is further telling that before the alleged SIRVA injury in 2020, Petitioner chose to receive a flu vaccine in his right arm, and doing so again in 2021 despite incurring his injury as a result of the prior year's vaccination.

This kind of documented vaccine administration error has previously been noted as "an issue that arises repeatedly in the specific context of SIRVA, both because SIRVA is a localized injury occurring near the site of injection and that because experience . . . has shown that pharmacy vaccine administration records are not necessarily reliable in documenting injection site." *Mezzacapo v. Sec'y of Health & Hum. Servs.*, No., 2021 WL 1940435, at *6 (Fed. Cl. Spec. Mstr. Apr. 19, 2021). Indeed, in *Mezzacapo*, testimony given by a Rite Aid pharmacist established that this error typically stems from inputs to be completed prior to the actual vaccination, because the request must be processed through the vaccinee's insurance, and that she always listed a left-arm injection site because most people are right-hand dominant. *Id.* This testimony was deemed consistent from similar testimony from other pharmacists in other cases. *Id.*

Although the record in the instant case does not contain any extrinsic evidence as strong as testimony from the pharmacist who administered the vaccine to Petitioner, the fact that Petitioner received several flu vaccines from the same pharmacy location over the course of several years, both before and after his SIRVA, with all records of vaccination containing the same evidence of error, is enough to establish that more likely than not, Petitioner received his August 17, 2020 vaccination in his right arm, instead of his left arm as documented. I further note that in every medical visit associated with his SIRVA, Petitioner consistently described the inciting event as a flu vaccine in his right shoulder.

Accordingly, I find that the evidence preponderates a factual finding that Petitioner received the flu vaccination in his right arm on August 17, 2020, not his left arm.

### B. Factual Findings Regarding a Table SIRVA

After a review of the entire record, I find that a preponderance of the evidence supports the conclusion that Petitioner has satisfied the Qualifications and Aids to Interpretation ("QAI") requirements for a Table SIRVA.

#### 1. Petitioner has no Prior Right Shoulder Condition or Injury

The first requirement for a Table SIRVA is a lack of problems associated with the affected shoulder prior to vaccination that would explain the symptoms experienced after vaccination. 42 C.F.R. § 100.3(c)(10)(i). Here, there is no evidence that Petitioner suffered from right shoulder pain before his August 18, 2020, vaccination. Respondent has also not made any argument suggesting he believes that Petitioner had a prior right shoulder condition or injury. Accordingly, Petitioner has met the first QAI requirement.

### 2. Pain Occurs with the Specified Timeframe (Onset)

Regarding the onset of Petitioner's pain, in order to meet the definition of a Table SIRVA, a petitioner must show that he experienced the first symptom or onset within 48 hours of vaccination (42 C.F.R. § 100.3(a)(XIV)(B)) and that his pain occurred within that same 48-hour period (42 C.F.R. § 100.3(c)(10)(ii) (QAI criteria)).

Respondent argues that Petitioner has failed to establish onset within the proper time frame because he waited until December 8, 2020, to first seek medical attention for his right shoulder, nearly four months after his vaccination. Response at 12. Respondent notes that in describing his pain to his doctors, Petitioner at various times referred to the pain as "sudden," "insidious," and "persistent" and argues that it is unlikely that he would've endured almost four months of pain that bad. *Id.* Respondent also argues that Petitioner was too vague in describing the onset of his symptoms to his doctors, using phrases such as "after getting a flu shot," "ever since" receiving a flu vaccine, and "as a result of [a] flu shot." *Id.*

Based upon my review of the record, I find that the evidence preponderates in favor of a finding that onset of Petitioner's right shoulder pain began within 48 hours of his August 17, 2020 vaccination. Although the medical records may not contain the optimal level of specificity when referring to the onset, they are consistent in Petitioner's recollection of having right shoulder pain suddenly and immediately after receiving the flu vaccine. *See* Exs. 3-7. Indeed, Petitioner repeatedly expressed the belief that the needle was placed too high in his arm as the reason his pain began. *Id.*

Additionally, Petitioner's almost four-month delay in seeking treatment is not out of the ordinary for SIRVA cases. Petitioner did not have any intervening medical visits between when he received the flu vaccine on August 17, 2020, and when he first sought treatment on December 8, 2020, and Petitioner himself noted that he did not immediately seek treatment for his right shoulder because he was hopeful that the pain would subside on its own. Ex. 3 at 1. This is a common refrain of petitioners who suffer SIRVA injuries. And even longer delays than four months have not proven enough prevent a finding of onset. *See, e.g., Williams v. Sec'y of Health & Hum. Servs.*, No. 17-830V, 2019 WL 1040410, at *9 (Fed. Cl. Spec. Mstr. Jan 31, 2019) (delay of five-and-a-half months); *Tenneson v. Sec'y of Health & Hum. Servs.*, No. 16-1664V, 2018 WL 3083140, at *5 (Fed. Cl. Spec. Mstr. Mar. 30, 2018) (nearly six-month delay).

Therefore, I find that preponderant evidence exists to find that Petitioner's right shoulder pain began within 48-hours of receiving a flu vaccine on August 17, 2020.

### 3. Petitioner's Pain and Limited Range of Motion was Limited to his Right Shoulder

The specific language of a SIRVA injury contained in the QAI of the Vaccine Injury Table is that "pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered." 42 C.F.R. § 100.3(c)(10)(iii) (QAI criteria)). Respondent argues that Petitioner's symptoms were not limited to his right shoulder because by March 2021, Petitioner began to report other complaints outside of his right shoulder, including pain in his left shoulder, right knee, and hips, and that from that point on, Petitioner's right shoulder complaints waxed and waned and were often overshadowed by complaints of pain in other parts of his body. Response at 14. Respondent concludes that because Petitioner's course of treatment was not limited to right shoulder pain, he has not satisfied this Table criteria.

By Petitioner's March 22, 2021, visit to his rheumatologist (at which time he complained of new onset of pain in his left shoulder, hips, and right knee), Petitioner had been suffering from right shoulder pain for over seven months. None of Petitioner's treating physicians ever indicated that they believed this new pain in other parts of his body was in any way related to the August 17, 2020 vaccination. Petitioner's diagnosed right shoulder conditions of bursitis, impingement, tendinosis, and rotator cuff tear would not be expected to cause pain in such distant parts of the body as his contralateral shoulder, hip, and knee. Thus, even assuming hypothetically that Petitioner's pain and limited range of motion was *not* limited to his right shoulder for the entire duration of his injury, Petitioner demonstrated exclusive right shoulder pain in excess of the six-month severity requirement and would therefore represent a compensable SIRVA injury for that time period alone.

Respondent's interpretation of this requirement would render the Vaccine Program unworkable if the mere fact of experiencing any pain in any other part of the body while simultaneously experiencing a SIRVA was disqualifying. Moreover, pain elsewhere in the body is readily distinguishable from a SIRVA, which would not likely lead to hip pain or knee pain, and it would be unreasonable to expect Petitioner to not report and seek treatment for these other pains simultaneously treating his right shoulder. Although there were times that Petitioner indicated pain was worse in other parts of his body than in his right shoulder, he consistently reported right shoulder pain at every medical appointment except for an annual exam with his PCP on August 19, 2021, when he indicated that his shoulder pain had resolved. Ex. 12 at 9. However, at a rheumatologist appointment two months later, he indicated he was experiencing mild, aching pain in his right shoulder. Ex. 10 at 5. While this distinguishable pain is not compensable as *part* of Petitioner's SIRVA, its existence does not disprove the SIRVA or defeat a QAI element.

14

Accordingly, Petitioner has satisfied the third QAI requirement for entitlement.

### 4. There is No Evidence of Another Condition or Abnormality

The last criterion for a Table SIRVA states that there must be no other condition or abnormality which would explain Petitioner's current symptoms. 42 C.F.R. § 100.3(c)(10)(iv). Once again, there is insufficient evidence in the record to suggest an alternative cause of Petitioner's right shoulder issues and Respondent does not argue that there is any evidence of another condition or abnormality. There is no serious contention that Petitioner's initial symptoms were brought on by anything other than his vaccination. While Petitioner's rheumatologist suspected possible inflammatory arthritis or PMR, further testing ruled out those diagnoses. Ex. 7 at 13; Ex. 14 at 1. Accordingly, I find that Petitioner has satisfied the fourth QAI requirement for entitlement.

### C. Other Requirements for Entitlement

In addition to establishing a Table injury, a petitioner must also provide preponderant evidence of the additional requirements of Section 11(c). The overall record contains preponderant evidence to fulfill these additional requirements.

The record shows that Petitioner received a flu vaccine intramuscularly on August 17, 2020. Ex. 1; *see* Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i)(I) (requiring administration within the United States or its territories). There is no evidence that Petitioner has collected a civil award for his injury. Petition at 4; Section 11(c)(1)(E) (lack of prior civil award).

As stated above, I have found that the onset of Petitioner's right shoulder pain was within 48 hours of vaccination. *See* 42 C.F.R. § 100.3(c)(10)(ii) (setting forth this requirement). This finding also satisfies the requirement that Petitioner's first symptom or manifestation of onset occur within the time frame listed on the Vaccine Injury Table. 42 C.F.R. § 100.3(a)(XIV)(B) (listing a time frame of 48 hours for a Table SIRVA following receipt of the influenza vaccine). I have also found that Petitioner's pain and reduced range of motion was limited to his right shoulder. 42 C.F.R. § 100.3(c)(10). Finally, I find that there was no condition or abnormality that would explain Petitioner's symptoms after vaccination. *Id*. Therefore, Petitioner has satisfied all requirements for a Table SIRVA.

The last criteria which must be satisfied by Petitioner involves the duration of his SIRVA. For compensation to be awarded, the Vaccine Act requires that a petitioner suffer the residual effects of his or her left shoulder injury for more than six months or required surgical intervention. *See* Section 11(c)(1)(D)(i) (statutory six-month requirement). Starting from August 19, 2020 (48 hours after vaccination), the records undoubtedly

15

demonstrate that Petitioner suffered the residual effects of his shoulder injury for more than six months. Thus, this requirement is also met.

Based upon all of the above, Petitioner has established that he suffered a Table SIRVA. Additionally, he has satisfied all other requirements for compensation. I therefore find that Petitioner is entitled to compensation in this case.

## Conclusion

**In view of the evidence of record, I find Petitioner is entitled to compensation. A damages order will be entered following the issuance of this ruling to direct the parties of the next steps in resolving damages.**

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master